UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | File No. 24-CR-00281 (JMB/DLM) |
| Plaintiff, | |
| v. | **ORDER** |
| Joe Henry Bandy, IV, | |
| Defendant. | |

This matter is before the Court on the Report and Recommendation (R&R) of United States Magistrate Judge Douglas L. Micko (Doc. No. 60) recommending the denial of the Motion to Suppress Statements Elicited While in Custody and Without the Presence of His Counsel filed by Defendant Joe Henry Bandy, IV (Doc. No. 39). Bandy objected to the R&R (Doc. No. 67), and the Government responded to his objections (Doc. No. 73). For the reasons explained below, the Court overrules the objections, adopts the R&R, and denies Bandy's motion.

## BACKGROUND

The factual background for this matter is largely uncontested and set forth in the R&R. Because the R&R provides a detailed history, the Court incorporates it into this Order and only briefly summarizes it here.

On October 17, 2024, Bandy was charged by indictment, and a warrant was issued for his arrest. (*See* Doc. Nos. 1, 3.) Bandy was arrested on December 10, 2024, and detained in county jail on the federal warrant. He was later charged by Superseding

1

Indictment with two additional counts stemming from evidence that officers discovered during the arrest: Possession with Intent to Distribute Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and Carrying a Firearm During and in Relation to Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A).

The day after Bandy was arrested, two special agents from the Bureau of Alcohol, Tobacco, and Firearms (ATF) transported Bandy from the county jail to the Minneapolis federal courthouse for an initial appearance on the original indictment. (Doc. No. 45 [hereinafter, "Tr."] 8:19–9:8, 10:3–10:9; *see also* Doc. No. 7.) The agents included Special Agent Andrew Wasmund, who was the case agent assigned to Bandy's case, and Special Agent Bryan Lervoog, who later testified that he was simply along to assist Wasmund with the transport logistics and had no specific knowledge about Bandy's case. (Tr. 8:25–9:11, 24:19–25:10.) On the way to the courthouse, Bandy and Lervoog spoke.

Lervoog initially warned Bandy not to discuss anything about his case—"I don't want to talk about any specifics of your case"—and directed Bandy not to ask him questions but to save any questions for his lawyer. (Tr. 10:10–11:5; *see also id.* at 29:10–29:24.)[1] Lervoog then generally described the initial appearance process. (*Id.* at 10:12–11:19.) Bandy then "asked why Hennepin County had sent a PC or a probable cause hold

---

[1] At the evidentiary hearing, Lervoog testified on direct that, prior to saying anything else, he told Bandy that he did not want to discuss Bandy's case. (Tr. 10:12–10:17.) On cross-examination, Lervoog acknowledged that his report from the transport "could be interpreted" to suggest that he first explained the initial appearance process generally before admonishing that he did not want to discuss Bandy's case. (Tr. 30:1–30:4.) The Court agrees with the Magistrate Judge that any minor inconsistency in the order of this particular discussion is immaterial. (Doc. No. 60 at 3 n.2.)

2

with [the agents] to give to the Marshals." (Tr. 11:24–11:25.) In response, Lervoog again instructed Bandy not to discuss the case: "I then explained to him that I didn't want him to respond" and warned, "I don't want you to say anything because your answers could be problematic." (*Id.* at 11:25–12:3; 12:20–12:23 (clarifying that "before [Lervoog] answered [Bandy's] question," Lervoog "told him not to respond to my statement in any fashion").) Lervoog then gave Bandy a general explanation about Hennepin County's probable cause hold, stating that "when [Bandy] got arrested, he may have had something that he shouldn't have had in his possession." (*Id.* at 12:4–12:6.) Lervoog did not speak "specifically about the specific facts of his Indictment" and believed he was simply explaining that Bandy "had been charged with a felon in possession on this date from certain incidents." (*Id.* at 17:9–17:12.) Lervoog did not ask Bandy any questions. (*Id.* at 13:3–5.) Despite Lervoog's clear instruction not to respond, and even though Lervoog's general explanation did not include any question or other invitation to respond, Bandy responded, stating "that he had a container with some stuff in it during his arrest." (*Id.* at 13:3–13:8.) Lervoog immediately told him to stop talking because "that was stuff he needed to bring up with his lawyer and not [Lervoog]." (*Id.* at 13:9–13:12.)

Bandy moved to suppress this statement,[2] arguing that it resulted from violations of his Fifth and Sixth Amendment rights. (Doc. No. 39.) The Magistrate Judge held a hearing on the motion at which Lervoog testified. After the hearing, the parties submitted

---

[2] The parties discuss only Bandy's statement that "he had a container with some stuff in it during his arrest," but the language of the motion to suppress refers to multiple statements. Because only one statement is actually at issue, the Court addresses only this one statement.

3

additional written arguments, and the Magistrate Judge issued the R&R on August 29, 2025, recommending denial of the suppression motion. Bandy objected to the legal conclusion in the R&R that because Bandy made the statement in question prior to his first appearance, the Sixth Amendment did not yet apply. (Doc. No. 67 at 3–7.) In addition, Bandy objected to the recommended determination that because Lervoog did not do or say something that would reasonably elicit an incriminating response, neither the Fifth nor Sixth Amendments compel suppression. (Doc. No. 67 at 7–11.)

## DISCUSSION

Applying de novo review of those portions of the R&R to which Bandy made specific objections, *see* 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b), D. Minn. L.R. 72.2(b), the Court agrees with the Magistrate Judge's recommendation. Bandy's statements during the December 11 transport did not violate either the Fifth or Sixth Amendments because Lervoog's actions were not reasonably likely to elicit incriminating statements, and Lervoog did not deliberately elicit incriminating information.[3]

---

[3] As noted above, Bandy also contests the Magistrate Judge's legal conclusion that the Sixth Amendment did not yet apply because Bandy had not yet had his first appearance. (Doc. No. 67 at 5–6 (concluding that binding Eighth Circuit precedent establishes that the Sixth Amendment right to counsel attaches at the initial appearance (citing *United States v. Morriss*, 531 F.3d 591, 594 (8th Cir. 2008) ("[A] criminal defendant's initial appearance before a judicial officer . . . marks the start of adversary judicial proceedings that trigger the Sixth Amendment right to counsel." (quotation omitted))))).) For purposes of this Order, however, the Court assumes without deciding that the Sixth Amendment attaches at the time of the indictment and prior to a defendant's initial appearance.

I.   **FIFTH AMENDMENT**

Bandy argues that the Fifth Amendment requires suppression of his incriminating statement. The Court disagrees. Because Lervoog's comments and actions were not reasonably likely to elicit an incriminating response, the Court denies this portion of Bandy's motion to suppress.

Under the Fifth Amendment, a defendant who is in custody must be given *Miranda* warnings before law enforcement officers can do or say anything that they "should know are reasonably likely to elicit an incriminating response." *United States v. Hatten*, 68 F.3d 257, 261 (8th Cir. 1995) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (explaining that "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect")). The Fifth Amendment, however, does not require suppression of voluntary statements or those made "not in response to interrogation." *Hatten*, 68 F.3d at 262 (quotation) (concluding that the Fifth Amendment did not compel suppression of a defendant's voluntary remark, which was made during an exchange that the defendant initiated); *see also United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005) (concluding that "[a]n officer's request for clarification of a spontaneous statement generally does not constitute interrogation"); *United States v. Turner*, 157 F.3d 552, 556 (8th Cir. 1998) (observing that a "voluntary statement made by a suspect, not in response to interrogation, is not barred and is admissible with or without the giving of

*Miranda* warnings" (citation modified)); *Butzin v. Wood*, 886 F.2d 1016, 1018 (8th Cir. 1989) ("An officer's attempt to seek clarification of an ambiguous statement is not generally construed as interrogation for *Miranda* purposes if the question does not enhance the defendant's guilt or raise the offense to a higher degree." (citation modified)).

In this case, Lervoog's comments were not reasonably likely to elicit an incriminating response for three reasons. First, Bandy voluntarily and spontaneously initiated the portion of the discussion that related to the Hennepin County hold, asking "why Hennepin County had sent a PC or a probable cause hold with [federal agents]." (Tr. 11:24–11:25.) Prior to this question, Lervoog had explained that Bandy would be getting booked in, fingerprinted, and meeting with the United States Marshals, someone from the pretrial services department, and a lawyer. (*Id.* at 11:13–19.) Because the question about a Hennepin County hold was not related to and was unsolicited by Lervoog's preview of what generally happens at a first appearance, Lervoog's comments were not reasonably likely to elicit any incriminating statements.

Second, Lervoog explicitly and repeatedly instructed Bandy not to make any statements and not to ask any questions. Lervoog testified that prior to explaining what generally happens at a first appearance, he advised Bandy not to say anything and not to ask any questions. (*Id.* at 10:13–20 ("I told him, I don't want to talk about any specifics of [his] case" and "I explained to him what an initial appearance was, what was going to happen, and then, just generally speaking, what the federal process was in Federal Court."); 10:25–11:5 ("I just told him . . . . if you have questions about your specific case, specific

6

charges, or anything like that, save those for a lawyer. . . . and to save those specific legal questions for him.").)  Despite this warning not to say anything and not to ask any questions, Bandy asked a question about a Hennepin County hold.  (*Id.* at 11:24-25.) Importantly, Lervoog explained that he was going to answer the question, but before he answered, Lervoog again advised Bandy not to respond to the explanation that Lervoog was about to provide.  (*Id.* at 11:25–12:3 ("I then explained to him that I didn't want him to respond. I don't want you to say anything because your answers could be problematic."); 12:20–23 ("Q. Now, before you answered his question, what did you say to him?  A. I told him not to respond to my statement in any fashion.").)  It is not reasonably likely for a person in custody to ask a law enforcement officer a question after the law enforcement officer has just advised the person not to ask questions and to save his questions for his attorney.  Likewise, it is not reasonably likely for a person in custody to respond with an incriminating statement after the law enforcement officer has just advised the person not to respond or say anything.  In his objection, Bandy directs this Court to no legal authority for the proposition that a law enforcement officer's instruction not to say anything can ever be reasonably likely to elicit any response, much less an incriminating one.

Third, even absent these repeated advisories, the content of Lervoog's statement that immediately preceded the incriminating response at issue was not reasonably likely to elicit any incriminating response.  Lervoog surmised that there was a Hennepin County hold because when Bandy was arrested, "he may have had something that he shouldn't have had in his possession."  (*Id.* at 12:4–6.)  This statement is different from the statements and

questions in the cases relied on by Bandy. It is not confronting Bandy with evidence against him or otherwise inviting him to deny the charges. Absent some caselaw to the contrary, it is not reasonably likely that this vague statement about what may have caused Hennepin County to issue a hold would elicit an admission of guilt or any other incriminating response.

Because Bandy initiated the portion of the conversation relating to the Hennepin County hold, disregarded Lervoog's clear instructions not to say anything and not to ask questions, and because Lervoog merely offered one possibility for the hold, Lervoog did not do or say anything that was reasonably likely to elicit an incriminating response. Therefore, no Fifth Amendment violation occurred, and the Court denies this portion of the motion.

## II.   SIXTH AMENDMENT

Bandy also argues that Lervoog's conduct violated his Sixth Amendment right to counsel. Again, the Court agrees with the Magistrate Judge's recommendation and denies the request to suppress the incriminating statement.

The Sixth Amendment prohibits law enforcement officers from deliberately eliciting incriminating statements from the accused in the absence of counsel. *United States v. Criswell*, 696 F.2d 636, 639 (8th Cir. 1983) (citing *Massiah v. United States,* 377 U.S. 201, 206 (1964)). The Sixth Amendment inquiry is similar to but slightly different from the Fifth Amendment right against self-incrimination because to determine whether the authorities "deliberately elicited" a statement, courts "look primarily to the intent of the

police." *Id.* at 639; *see also, e.g.*, *Fellers v. United States*, 540 U.S. 519, 524–25 (2004); *United States v. Ehrich*, No. 12-CR-57 (RHK/LIB), 2012 WL 2277853, at *4 (D. Minn. Apr. 25, 2012), *report and recommendation adopted*, 2012 WL 2277889 (D. Minn. June 18, 2012) (noting that for Sixth Amendment purposes, deliberate elicitation requires a government agent's "intentional effort . . . to secure incriminating statements from the accused" (quoting *United States v. Rommy*, 506 F.3d 108, 135 (2d Cir. 2007) (internal quotation marks omitted)). There can be no Sixth Amendment violation where a suspect spontaneously or voluntarily makes an incriminating statement or where the words or actions of a law enforcement officer unintentionally resulted in an incriminating response. *Fellers*, 540 U.S. at 524–25 (concluding that law enforcement officers deliberately elicited incriminating statements in violation of the Sixth Amendment when they began an exchange with the defendant by informing him that they had come "to discuss his involvement" in the crime for which he had been indicted); *Criswell*, 696 F.2d at 638–639 (concluding that law enforcement officers did not deliberately elicit incriminating statements in violation of the Sixth Amendment when, during a "general conversation" with defendant, which included a discussion about "penalties for the charged offenses," the defendant spontaneously and voluntarily remarked that he and his co-defendant were "just two guys who [messed] up"); *United States v. Williams*, No. 07-CR-211 (MJD/JSM), 2007 WL 3037349, at *4–5 (D. Minn. Oct. 16, 2007) (concluding that a law enforcement officer did not deliberately elicit incriminating statements in violation of the Sixth Amendment when the officer answered defendant's question asking why he was being arrested, and

9

defendant thereafter made an incriminating statement); *Ehrich*, 2012 WL 2277853, at *5 (concluding that a law enforcement officer did not deliberately elicit incriminating statements in violation of the Sixth Amendment when the officer answered defendant's question asking who had accused him of the crime, and defendant thereafter made an incriminating statement).

In this case, Lervoog first explained what Bandy could expect to happen at the first appearance. (Tr. 11:13–19).) Then, in response to Bandy's unsolicited question about the Hennepin County hold, Lervoog explained that "he may have had something that he shouldn't have had in his possession." (*Id.* at 12:4–6.) There is no evidence in the record that Lervoog made either statement with the intent to elicit an incriminating response. Moreover, there is evidence that Lervoog did not intentionally do or say something to elicit the incriminating statement: it was Bandy who asked an unsolicited question about the Hennepin County hold (*id.* at 11:24–25), and Lervoog who repeatedly instructed Bandy not to make any statements and not to ask any questions (*id.* at 10:13–20; 10:25–11:5; 11:25–12:3; 12:20–23). Given the uncontested facts in this case, the record presented does not support the conclusion that Lervoog intentionally or deliberately elicited an incriminating response from Bandy. Thus, the Court denies this portion of the motion as well.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendant's Objections (Doc. No. 67) to the R&R are OVERRULED.

2. The Report and Recommendation (Doc. No. 60) is ADOPTED.

3. Defendant's Motion to Suppress Statements Elicited While in Custody and Without the Presence of His Counsel (Doc. No. 39) is DENIED.

Dated:  November 7, 2025               /s/ *Jeffrey M. Bryan*
                                        Judge Jeffrey M. Bryan
                                        United States District Court